## MacGregor v. MacGregor, et al.

1. ANSWER: CROSS-BILL. The respondent, in an action in chancery, cannot, in his answer, pray for relief. The prayer for relief can be made only by bill, or by making the answer a cross-bill.

2. JURISDICTION. Courts cannot sustain jurisdiction of naked questions of title to lands beyond the limits of the State; but the jurisdiction of a court of equity is sustainable, wherever the person of the defendant may be found, in cases of trusts, of fraud and of contract, even though lands not geographical may be effected by the decree.

3. SAME: EFFECT OF DECREE. A decree cannot operate as a conveyance of land outside the jurisdiction, but when the court has jurisdiction of the parties, it may decree a conveyance of such lands and carry such decree into effect in the manner in which other decrees are enforced. Such decree will be regarded by other courts as conclusive until reversed or annulled.

4. TRUSTEES. Trustees accepting a trust under a will are bound to execute it in the manner pointed out in the will.

5. TRUST: ELECTION. If money held by trustees be invested in property, into which it can be traced, in violation of the terms of the trust, the beneficiary may elect to follow the same into the investment thus made, or he may hold the trustee personally liable for a breach of duty.

6. SAME. A fund was bequeathed to trustees upon the following trust: The principal sum to be invested in bond and mortgages upon unincumbered real estate, and the interest or income paid to A. M. during her life; after her death, if she left no children surviving her, to her husband during his life; if she should leave children surviving her, then after the death of herself and her husband, the principal to be paid to the next of kin of the husband; Held,

1. That neither the said A. M. nor her husband can elect to follow the principal fund into real estate in which it has been wrongfully invested by the trustees.

2. That such election can be made only by the residuary legatee.

*Appeal from Dubuque District Court.*

### SATURDAY, APRIL 9.

Prior to 1840, and up to the time of commencing this action, the respondent, Alex. MacGregor, with his family resided either in Prairie du Chien, Wisconsin, or at the town of MacGregor, in this State. The complainant, James, during the greater part of this time, resided in New York.

Gregor and Duncan MacGregor were brothers of these parties. Gregor died in February, 1845, leaving a will, the 7th clause of which is as follows:

"I direct that my executors shall collect and receive the first payment and all interest which shall become due upon a certain bond and mortgage for the payment of $800, with interest, executed by David Conklin to James MacGregor, Jr., and assigned to and now held by me, which said bond and mortgage bears date the 3d day of March, 1843, and which said mortgage is recorded in the clerk's office of the county of Ulster, in book 32, of mortgages, pages 4, 5 & 6, —and I do hereby give and bequeath to my brothers Duncan MacGregor and James MacGregor, Jr., the residue of said bond and mortgage; and also a bond and mortgage executed to me by my brother, James MacGregor, Jr., bearing date the 23d day of September, 1843, and conditioned for the payment of $1291,46, on the 23d day of December, 1845, with interest; which said last mentioned mortgage is recorded in the clerk's office of the county of Columbia, in book 3, of mortgages, at page 331 and 332; and in case the sum remaining unpaid at my decease, on said last mentioned bond and mortgage, including interest to that time, together with that portion of the first above mentioned bond and mortgage bequeathed to my said brothers as aforesaid, shall not amount as of the day of my decease to the sum of two thousand dollars, then I give and bequeath to my said brothers such sum of money as will make up the deficiency. The said sum of money and bonds and mortgages so bequeathed to them as aforesaid, and all moneys which may be received or collected thereupon, to be held by the said Duncan Mac-Gregor and James MacGregor, Jr., upon the following trusts: That is to say that the said Duncan MacGregor and James MacGregor, Jr., shall pay over the interest or income thereof, to Anne MacGregor, the wife of my brother Alexander MacGregor, during her life, upon her sole or separate order or receipt, and for her sole and separate use, and free from the debts, control or interference of her husband;

and in case the said Anne shall die leaving no children her surviving, but leaving the said Alexander her surviving, then after her decease to pay over to the said Alexander, during his life; and that the said trustees shall, from time to time, as often as a sufficient amount shall be collected or received by them upon this bequest, and which is not to be paid over as income to the said Anne or Alexander, invest the same in bond and mortgage upon unincumbered real estate, and keep the same so invested during the period in which they are to pay over the income thereof as aforesaid; said bonds and mortgages to be taken in the names of the said Duncan MacGregor and James Macgregor, Jr., as trustees, and in that capacity, and the interest thereupon to be paid annually, and that the said trustees shall, at the death of said Anne, if she shall die, leaving children her surviving, then, when both she and her husband Alexander shall have died, pay over the said principal sum to the next of kin of the said Alexander living at the time said sum is directed to be paid over as aforesaid—those who are of equal degree to the said Alexander to take in equal shares, and those who are of unequal degrees to take according to their respective stocks."

From 1845, to 1852, James acquired the legal title to a large amount of real estate in Iowa, Illinois and Wisconsin. He gave to Alexander several powers of attorney, authorizing him to purchase and sell real estate for him in those States, to lease and manage the same, and to execute deeds, &c. Most of the land acquired by James was purchased by Alexander, and in a word, to Alexander was entrusted the general management of the entire real estate operations. As attorney for James, he executed a great number of deeds, and on the 7th of December, 1852, he conveyed, as such attorney, to his two brothers-in-law, Egbert and George D. Gardner, by separate deeds, all of the real estate remaining in James, situated in this State.

The deed to Egbert is for the expressed consideration of one dollar, and conveys about six hundred acres of land. That to George D., includes the land in and about the town

of MacGregor, and that which will hereafter be known as the Ferry Property. The expressed consideration in this deed was two thousand dollars.

In January, 1853, the complainant filed the bill in this case, claiming that the deeds to the Gardners were fraudulent and void, being made without consideration, and for the sole and express purpose of defrauding complainant. The bill also claims that Alexander, while acting as complainant's attorney, received large sums of money as the proceeds of the sales of his land. The prayer is, that the deeds to the Gardners may be declared fraudulent and void, and be set aside, and that Alexander be required to give account for all moneys in his hands, and for judgment, &c. Alexander and the Gardners were originally the only parties defendants, but subsequently the two children of Alexander, (Gardner & Gregor,) Anne G., (the wife of Alexander,) and the brother Duncan were made defendants.

The answers admit that the deeds to the Gardners were made without consideration, but deny all intention to defraud. With regard to a great portion of the land, aside from that known as the Ferry Property, it is claimed that it was bought with the money of Alexander, in the name of complainant, but for the sole use and benefit of said respondent; that the object of executing the said powers of attorney was to enable respondent to occupy and sell all of the property purchased, or otherwise use the same as his own; and that complainant was to convey the same when requested.

The answers also set up that the one hundred and sixty acres upon which the town of MacGregor is situated, was purchased by Alexander and one Burnett, as early as 1837, and that soon after their purchase, they established a ferry across the Mississippi river, from Prairie du Chien to the south-east corner of said tract, and that Alexander has operated the same ever since; that in 1841, they purchased another tract of 14.90 acres, about one-half mile below the 160 acre tract; that in 1844 he procured, by assignment, the pre-emption right to a tract containing 99.05 acres; that

in 1845 a patent was issued for the same in the name of James, in whose name the assignment was taken; that a great portion of the money expended in and about obtaining the said assignment and making the entry, was furnished by Alexander; that in 1841, one Olmstead, with money furnished by Alexander, entered another 40 acre tract, and took the certificate of purchase in his own name, and at Alexander's request assigned it to James; that before the purchase by Olmstead it was understood that Burnett was to have one half of it, by paying one-half of the expenses; that he declined to comply with this arrangement, and proposed to sell his interest in the 160 and 14.90 acre tracts and in the ferry, including boat, tackle, &c., and also his claim in the 40 acre tract; that he offered to take $1465; that Alexander informed James, who was then at Mac-Gregor, of said proposition, and that he agreed that if he could raise the money when he returned to New York, he would send it out and pay Burnett for Alexander's benefit; that he did send out, soon afterwards, $1500, from which Alexander paid Burnett and took the deed in the name of James. This was in 1845, and the answers allege that when the $1500 was received it was not known by Alexander from what source it was obtained from complainant, but that in 1847, Alexander and his family were in New York, and then learned, for the first time, from Duncan, the other trustee of the $2000, that it was, by agreement between him and James, taken and sent as a part of the trust fund held under the will of Gregor; and that this, with some $500, before advanced by James to Alexander, were intended to stand in the place of that fund, and to be invested in the Iowa property; that they (Alex. and Anne) assented to this arrangement and investment, and desired James to convey the property to them accordingly; that he refused to do this; that the $2000 was never otherwise invested, and that at the request and upon the direction of Duncan, they continued to occupy this (called the Ferry Property) as their own.

It is also stated that in 1851, James came to MacGregor,

insisted upon a settlement with Alexander, and that he finally succeeded, by fraud and oppression, in getting the said Anne to give to him her note for $4500, and to take from him a bond to convey to her the Ferry Property upon the payment of that sum with interest—that he also agreed to convey to her other lands, and made a deed for the same and deposited it with one of the Gardners, to be delivered to Anne when new trustees should be appointed in Iowa for the $2000 trust fund, and she should execute a mortgage on the said lands for said $2000, to the new trustees, securing the principal and income as intended by ·the will of Gregor; that Duncan refused to consent to this arrangement, and that in accordance with his advice and that of counsel, Alexander, as attorney of James, conveyed the lands to the Gardners, with no fraudulent intent, but for the purpose of having them held, in part, in trust for the benefit of the persons named in the will, and in fact, in trust for Alexander, in accordance with the understanding between him and James, that the lands purchased and thus conveyed, other than the Ferry Property, were in fact purchased for Alexander and with his means.   It is denied that Alexander made sales of any lands for which he should account, or that he is indebted to James; and finally, it is insisted that the arrangement made in 1845 between Duncan and James, in relation to the investment of the $2000, shall be carried out by securing to the said Anne the land known as the Ferry Property, for life, and to her children and husband according to the provisions of the said 7th clause of the will of Gregor; that the agreement of the said Anne, made in 1851, to purchase the ferry, is void; that Alexander may be decreed to be the owner of the Ferry Property, subject to the trust of $2000, and that the remaining lands may be decreed to be held by Gardner, in trust for Alexander.

The separate answer of Anne G. shows, and it otherwise appears, that in December, 1852, she and her infant children, Gregor and Gardner, instituted proceedings in the Supreme Court of the State of New York, against said

James and others, for the purpose of restraining James from collecting the note of $4500; to have the agreement, made at the time the said note was given, declared void; to have James and Duncan discharged as trustees; to have the Gardners declared the trustees, holding the Ferry Property in trust for said Anne, remained to Gregor and Gardner MacGregor, (her co-complainants); that Duncan and James should, as trustees, release all right to said property, and that all claims of Alexander, if any, might be ascertained and declared.

The replication takes issue upon most of the new matter set up in the answers. It is, however, stated that the agreement of 1851, was not obtained by fraud as charged, but that plaintiff was willing to rescind it, and that since December, 1852, he had regarded it as rescinded, and asks that it be so declared, he being ready to cancel or deliver up the note. It is admitted also that Alexander did own one undivided half of the 160 acres and the tract of 14.90, but that he, complainant, owned the other half, and as to all the other lands, they were his, absolutely, free from any claim or right of the said Alexander to the same. The pendency of the action in New York is admitted that said court had jurisdiction over his person as to matters of a transitory nature; but protests that they cannot interfere with the titles and ownership of real estate in the State of Iowa; that since the filing of the answer of the said Anne, the said suit had been determined in favor of the said James, and that the judgment therein was still of full force, unreversed and unannulled. It is also alleged that said $2000, is invested in New York, and was so invested long before the commencement of the present action; that at the time of the agreement in 1851, the deed was deposited by him with Gardner, for the benefit of Anne, to be delivered to her when she should execute the mortgage to new trustees, and when a certain order of the Supreme Court of the State of New York, in relation to the transfer of said trust fund should be complied with, and the said Duncan and complainant should be released as such trustees by the surrogate of the city of

New York; that they never were released, that the only order ever made contemplated the appointment of trustees in Iowa, and payment to such trustees by himself and Duncan, of the $2000, and any interest in their hands; that the Iowa · trustees had never qualified or given bond, and that they had therefore never paid over the trust money or fund.

The rejoinder denies everything in the nature of new matter set up in the replication, and says that the order in relation to the change of trustees in New York was obtained by fraud, without the knowledge of Duncan, the co-trustee, without the consent of the parties interested in the fund, or that it was made as set out in the replication.

The cause was heard upon the pleadings and a large amount of testimony. At the June term, 1857, a decree was entered, in which it was found that the $2000 was, by agreement of the trustees named in the will, invested in the lands and estate known as the Ferry Property, and it was ordered and decreed "that the undivided half of the aforesaid tracts of land are the fund of $2000; that the same shall be conveyed by George D. and Egbert Gardner, to George D. as trustee, to hold the same for the use of Anne G. MacGregor, during her life, and afterwards to the use of the persons who shall be entitled to the same, under the said claim of said will." It was also ordered that the note of $4500 be given up, and canceled. The matters of account and all other matters in controversy in the action, were referred to a referee, to adjust and report upon the same. At this stage of the cause, and before the referee had reported, complainant appealed.

*Smith, McKinley & Poor*, for the appellants.

I. It appears from the pleadings and evidence, that the real estate was purchased in the name of James MacGregor, Jr., with his own money. It cannot be shown by parol that such purchase was for the use of another. 1 White and Tudor's Leading Cases, [Phil. Ed. 1849.] page 176.

II. There is no pretence that the original purchase was made with the trust fund. In order to create a resulting trust, the specific fund must have been used in the purchase.

*Taylor* v. *Plumer*, 3 M. & S., 578; 1 White and Tudor's Lead. Cases, [Phil. Ed. 1849,] pages 176 and 177; 2 Story's Eq. Jur. sec. 1210.

III. An express trust by subsequent verbal contract cannot be shown, as it would be in the teeth of the Statute of Frauds. Section 5 on page 271 of Rev. Stat. of 1843, enacts that "all declarations or creations of trust or confidence of any lands, tenements or hereditaments shall be manifested and proved by some writing signed by the party, who, by law may be entitled to declare such trust or confidence, or by his last will in writing, or else the same shall be utterly void and of none effect."

IV. The pretended verbal contract made in 1845 between Duncan and James, that the lands in Iowa were to constitute the trust fund, is not only void as being within the provisions of the Statute of Frauds, but void for want of power to make such a contract. There is no pretence that Anne G. and her minor children assented to the arrangement at the time, or knew any thing of it; and as these minors are the ultimate beneficiaries or owners of the two thousand dollars, it is absolutely necessary that they should be legally represented in the making of such a contract to render it valid.

V. Nor do the facts in the case justify the belief that such a contract was ever made. It is alleged in the cross proceeding, but denied under oath by answer of James MacGregor, Jr., and it cannot be proved by any other unwritten evidence; his answer is conclusive. Code, sections 2412 and 2413. Such an arrangement, if proved, would be utterly void for want of mutuality between the parties in interest. *Usher* v. *Livermore*, 2 Iowa 122.

VI. The Supreme Court of New York has decided that the trust fund is invested there according to the terms of the will, and has adjudicated in a case where all the parties were directly concerned, that James MacGregor, Jr., shall

not "release all right to the property in Iowa mentioned in the complaint." Such a decision is final and conclusive between the parties.

*Sturdevant* v. *Pike*, 1 Carter's Ind. R. 277; *Massie* v. *Watts*, 6 Cranch 148; 2 U. S. Cond. 333; *Mead* v. *Merritt*, 2 Paige's Ch. 404; *Mitchell* v. *Bunch*, Ib. 606, 615; *McLean* v. *La Fayette Bank*, 3 McLean's Rep. 622; 2 Story's Eq. Jur. sec's 743 and 744.

VII. A tenant, agent or attorney in possession, cannot dispute the title of his landlord or principal. The entry and holding possession by Alexander MacGregor as agent and attorney estops him from setting up a title in his own right.

*Sturdevant* v. *Pike*, 1 Carter's Ind. Rep. 277; *Baker* v. *Whiting*, 3 Sumner, 482; *Schedda* v. *Sawyer*, 4 McLean 181; *Moore* v. *Moore*, 1 Selden, N. Y. Rep. 256; *Welford* v. *Chancellor*, 5 Grattan, 39; Dunlap's Palcy's Agency, 53.

VIII. It is not deemed necessary in this case to go into an argument to show that the trustees could not divert the trust fund from its original destination as expressed in the will. However easy such a proposition might be proved, it is enough to say that that point has been adjudicated by the the local courts in New York, who are abundantly capable of settling all questions pertaining to the trust.

IX. It was the intention of Gregor MacGregor to give Anne G. and her children, two thousand dollars in such a way that her husband could in no manner control it, or interfere with it. If Alexander MacGregor is now permitted to figure in this transaction, to make bargains and strike out a new course of policy for the investment of the trust fund, it will work an entire subversion of the testator's intent, and probably end in bringing about all the mischief which was sought to be prevented by putting the fund beyond his control.

X. The act of Congress of 5th April, 1832, [4 U. S. Stat. at Large 503,] under which Samuel B. Olmstead purchased the north-west of north-east 27, 95, 3 west, required him to make affidavit that he entered the land for his own personal benefit and not in trust for another. Olmstead

MacGregor v. MacGregor, et al.

made such affidavit, and the purchase could not be for Alexander MacGregor's benefit.

XI. Fractions 1 and 2 in section 22, 95, 3 west, were entered by Samuel B. Olmstead, under the act of Congress of 4th September, 1841, [5 U. S. Stat. at Large, 456.] Under the 12th section of that act all transfers and assignments of Olmstead's right made prior to the issuing of the patent were null and void. The patent did not issue till 1853. James MacGregor, Jr., obtained a deed from Olmstead in 1853, after the issuing of the patent. Thus James is the only one who has title to that tract.

XII. Anne G. cannot have a decree for specific performance, as prayed for by her. She should have been prompt and ready to perform on her part. 2 White and Tudor's Lead. Cases, part 2 page 30 of Phil. Ed.; 4 Peters, 311; 2 Story's Eq. Juris., sections 736, 750, 751 and 771. 2 Parsons on Cont. 191. Even if she had right to such decree, she should have obtained it in the suit in New York. *Wright* v. *Marsh, et. al.*, 2 G. Greene, 117; referring to *Bruen* v. *Hone*, 2 Barb. 596.

*F. E. Bissell*, for the appellees.

I. When land has been conveyed to the party having the equitable title to it, or to some third person to his use, the person in whose name the title was originally taken, in seeking to recover it back, cannot insist that it is incompetent to show by parol that the property had been conveyed to the real party in interest, or to his use. In an action for a specific performance, the defendant may use parol evidence to defeat the plaintiff, notwithstanding the Statute of Frauds, Story Eq. Jur. sections 330, 373, 754, 757, 759, 761, 769–70 and note *a*.

II. The specific trust fund did go into the land in controversy. Story Eq. Jur. section 322; 465 and note; 1261–63.

III. We claim no express trust by subsequent verbal contract, but do claim that at the time the -arrangement was entered into, it was evidenced to a certain extent by an irrev-

ocable power of attorney, in writing, executed by plaintiff to Alexander MacGregor, which conferred upon him absolute authority over the trust property.    3 Story R. 181.

IV. The lands may be declared by the court to be the trust fund without any assent of the *cestue que trust* given at the time of the investment.    3 John. Ch. 261 ; 4 John. Ch. 136.

V. The answer is not a cross-bill ; it sets up only a defense. The answers are under oath and must be considered as evidence in the case.    Section 3 Wend. 637, 1 Gil. 470 ; Story Eq. Pl. section 761–768.

VI. The evidence shows that the New York judgment was rendered in the Supreme Court, and that it is now pending on appeal in the Court of Appeals.    It stands as no judgment.

VII. The defendants do not hold the property in controversy as the tenants, agents or attorneys of the plaintiff, and are not estopped from denying this title.

VIII. While it is true that the trustee has no legal authority to divert the trust fund, if he wrongfully does so, the *cestue que trust* may follow it wherever it goes.

IX. If the *cestue que trusts* desire this fund invested in these lands, and the trustees have so invested it, and if it be shown to the court that the investment is a judicious one, it will not order that the property be conveyed back to the plaintiff, and force the *cestue que trusts* to proceed against him for the fund, especially after he has procured his release by the court in New York, and has invested the fund in Iowa.

WRIGHT, C. J.—The parties concur in the conclusion, though upon different grounds, that so much of the decree as relates to the note of $4500, shall remain undisturbed. The agreement made in 1851, therefore, and all rights and liabilities arising under it, may be determined without further notice.

Nor is the case ready for hearing in this court, except as to the question of the investment of the $2000 in the Ferry

MacGregor v. MacGregor, et al.

Property, all the other matters in controversy being at the time of appeal in the hands of the referee.  We are, then, to inquire whether the decree as to the Ferry Property, or the trust fund is correct, and this inquiry, we are compelled to answer in the negative.  Our reasons for this conclusion we will state briefly.

And, in the first place, it was improper under the proceedings to give the relief granted to the respondents.  They filed no bill, nor are any of their answers made cross-bills. The most and all they could ask, was that they might be dismissed the court.  If they had any relief to ask or discovery to pray for, they should have done so by bill, or by making their answer a cross-bill.  *Compten* v. *Comer* 4 Iowa 577; *Armstrong* v. *Pierson*, 8 Iowa 29; *Siverly* v. *State*, Dec. T. 1858.

In the second place, it seems to us that this question was adjudicated between these parties in the New-York case, and so long as that judgment remains in force it must be conclusive.  It will be observed from the statement of the cause that the bill of Anne G. and her infant children, as filed in New-York, prayed the same relief based upon the same facts as are set up in the answers of Alexander and others in this case.  That action was commenced in the Supreme Court of Saratoga County, heard upon full testimony and submitted to a referee.  Upon the coming in of his report it was ordered and adjudged that no portion of the trust fund created by the last will and testament of Gregor MacGregor, deceased, mentioned in the complaint in this action, created for the benefit of the plaintiffs and others, has ever been transmitted to, or invested in land in the State of Iowa, and that the said fund is now in the hands of said Duncan MacGregor and James MacGregor, Jr., trustees; and it is further ordered and adjudged that the plaintiffs are not entitled to judgment that James MacGregor, Jr., release all right to the property in Iowa mentioned in the complaint.

Complainants appealed to the General Term of the Supreme Court, and there the judgment was, after argument,

affirmed in all respects. The cause was then taken to the Court of Appeals, and there the appeal was dismissed. The property mentioned in the complaint filed in that case covered that known as the Ferry Property in this.

It is insisted that the judgment rendered in New York does not conclude the parties for the reason that the courts of the State had no jurisdiction of the subject matter involved in this controversy; that the lands being in this State, the courts of New York could do nothing as to the title to such lands. The rule upon this subject, as stated in *Massie* v. *Watts*, 6 Cranch 148, is, that in cases of fraud, of trust or of contract, the jurisdiction of a court of chancery is sustainable wherever the person may be found, although lands not within the jurisdiction may be affected by the decree. When the case, however, involves a naked question of title, the courts of a State other than that where land is situated, cannot sustain their jurisdiction. "But when the question changes its character, when the defendant is liable to the plaintiff either in consequence of contract, or as a trustee, or as the holder of a legal title acquired by any species of *mala fides* practiced on the plaintiff, the principles of equity give a court jurisdiction wherever the person may be found, and the circumstance that a question of title may be involved in the inquiry and may even constitute the essential point on which the case depends, does not seem sufficient to arrest that jurisdiction. *Massie* v. *Watts, supra*. See also the authorities there cited. *Earl of Kildare* v. *Fitzgerald*, 1 Vern. 419; *Arylasse* v. *Muschamp*, Ib. 135; and 2 Story's Eq. Jur. 744–'5; Story's Conflict of Laws, 544–'45; *Penn* v. *Lord Baltimore*, 1 Vesey 444; *Sturtevant* v. *Pike*, 1 Carter's Ind. 277; Story's Eq. Pl. 489; *McLean* v. *Lafayette Bank*, 3 McLean, 622.

The jurisdiction is sustained upon the principle that in all cases in equity the primary decree is in *personam* and not *in rem*, and that in these cases peculiarly the courts having authority to act upon the person may make decrees not binding the land itself, but the conscience of the party in

regard to the land, and compel him to perform his contract, execute his trust, or answer for the fraud according to conscience and good faith.   In a case for the specific performance of a contract to convey lands, for instance, if the lands lie within the reach of the process of the court, courts of equity instead of relying exclusively on the proceedings *in personam*, will act upon the thing or property also, and put the successful party in possession, if the other party refuses to comply with the decree.   But, says McLean, J., while a decree cannot operate as a conveyance of land out of the State, as it does under the statute within the State, yet this is a matter which does not affect the jurisdiction.   Having jurisdiction of the parties by a voluntary appearance, the court may decide the controversy between them, and effect may be given to the decree as the law shall authorize.   3 McLean, 522.

The case in 1 Carter, 277, was this: Gage was the son-in-law of Col. Zebulon Pike, and had from his father-in-law, a power of attorney to sell certain lands in Ohio.   The attorney deeded them to one R. and immediately received a re-conveyance of the same to himself, adopting this as a mode of acquiring the legal title.   After Col. Pike's death his heirs filed a bill in the Dearborn Circuit Court in Indiana, asking among other things that the conveyance to Gage might be set aside, and that he be required to relinquish to the heirs the lands embraced therein.   Gage answered, admitting the conveyance as charged, but said that Col. Pike was indebted to him in a sum exceeding the value of the lands, and that he adopted the transaction complained of as a mode of obtaining payment.   Gage was required to relinquish to the heirs, and Perkins, J., in delivering the opinion says: "The land, the principal subject matter of this suit, lies in Ohio, out, of course, of the jurisdiction of the courts of this State, but as the defendant interested in the controversy was brought directly before the Circuit Court, it was authorized, as a court of equity, to take cognizance of the cause under

the general rule that courts of equity act upon the person."

The case of Massie v. Watts was this: Watts brought his suit in equity in the Circuit Court of the United States for the District of Kentucky, against Massie, a citizen of that State, to compel him to convey one thousand acres of land in the state of Ohio, the defendant having the legal title with notice of the plaintiff's equity. An objection was made to the jurisdiction of the court. In delivering the opinion, Marshall, C. J., after reviewing the facts, says: "If we reason by analogy, from the distinctions between actions local and transitory at common law, this action would follow the person because it would be founded on an implied contract or on a neglect of duty. If we reason from these principles which are laid down in the books relative to the jurisdiction of the courts of equity, the jurisdiction of the Court of Kentucky is equally sustainable, because the defendant, if liable, is either liable under his contract or as a trustee."

Upon the authority of these cases and the others before cited, we think it clear that the court of New York had jurisdiction, and that the judgment entered must bind the parties as also the courts of this State. It was charged by the complainants in that case that the trust fund had been transferred to Iowa with the consent and knowledge of the trustees, and invested in certain lands, and the prayer was that the Gardners should be declared to hold the said lands upon the terms set out in the deed of Alexander to George D., and that the trustees under the will of Gregor, should release all right to said property. By reference to the transaction between Alexander and George D. Gardner it appears that Gardner held the lands conveyed to him in trust as follows: These tracts (the Ferry Property,) for the use of Anne G. during life, and to the use of the children of the said Anne G. and Alexander after her death, in accordance with the provisions of a will of Gregor MacGregor, and an agreement (in respect certain trust funds) of said James and Duncan MacGregor, the trustees appointed by said will—and a fourth tract for the use of Alexander, for whose use the same had

MacGregor v. MacGregor, et al.

been before held by James, now when it is remembered that the Supreme Court of New York found against the complainants in that case upon every material point made in the bill, and denied the relief asked, it would seem that argument was unnecessary to show the binding effect of that judgment upon the parties to the litigation; the parties are the same, the issues are the same, and having been once settled by the judgment of a court of competent jurisdiction, we have no disposition, if we had the power, to re-open the controversy for another, or further examination.

But, in the third place, treating it as *res integra*, we are satisfied upon the facts that the judgment in New York was right, and such as the court below should have rendered. There can be no ground for misconceiving the intention of the devisor in bequeathing the $2000 to the trustees, and not the least difficulty in understanding their duty. Neither the brother nor his wife had any right to touch or use the principal sum, the interest or income was hers during life— after the death of both the children if any were to receive the principal and any interest still remaining in the hands of the trustees. This $2000 was to be invested in bond and mortgage, upon unincumbered real estate, and to be kept invested in this manner during the period that they were to pay over the income, or until the principal was required to be paid over to the children or next of kin. Now it must be plain to the comprehension of any person, that the trustees would violate the duties devolving upon them by virtue of the provisions of this will, to invest the trust fund in the purchase of lands instead of in bonds and mortgages upon unencumbered real estate. It was perfectly competent for the devisor to direct how this money should be used, and to determine what kind of an investment would be most advantageous to the beneficiaries. Having accepted the trust, the trustees were bound to execute it in the manner pointed out in the will; and it was not for them to say whether the mode adopted by the devisor for securing this fund to the recipients was wise or unwise, just or unjust. If they could buy lands, so they could

personal property, speculate in stocks, or invest the fund in any other manner to suit their own notions of what would be most to the advantage of the *cestue que trust*. No such discretion or power was given to them however.

Viewing the question then singly in this aspect there could of course be no ground for claiming that these lands were, in the language of the decree in the court below, "the fund of $2000 described in the seventh clause of the will of Gregor MacGregor." The claim is, however, that if the trust fund was actually invested in real estate, (in this case the Ferry Property) the beneficiaries may follow it and claim the benefit of the new investment, or the estate purchased; and there is no controversy as to the rule upon this subject. If money held by trustees is invested in any other property into which it can be traced, the beneficiary may elect to follow the same into the investment thus made, or he may treat and hold the trustees personally responsible for a breach of duty. This principle, however, though ever so just and well settled, has no application to this case. It has no application for two reasons:

The *first* is, that respondents fail to show that the Ferry Property was purchased with the trust money. That it was thus purchased is affirmed by them and denied under oath by complainant.

We need not say, therefore, that it is the duty of respondents to satisfy the court of the truth of this averment. They affirm, and they must therefore prove. The testimony upon this part of the case is quite voluminous. To refer to it in detail would unreasonably and unnecessarily extend the length of this opinion. We state therefore, that the impression made upon our minds after reading the immense mass of testimony contained in the record, and the conclusion to which we have arrived is, that the trust fund never was in fact transferred. We are satisfied that complainant contemplated making the transfer, and that Duncan supposed it had been made. This intention, however, was never executed or carried into effect. The money, if invested any where, remains in New York.

Such was the conclusion of the courts of that State, and of its correctness there can be no fair room for doubt.

But, in the second place, the rule referred to has no application because the respondents have no right to elect to follow the trust fund (if it was invested as claimed,) into these lands. It was the capital and not the income, that it is insisted was thus invested. This capital, as we have seen, belongs not to Alexander nor to Anne G., but to the residuary legatees. Who these may be cannot now be known. They are the persons however, that have the right of election, and not those who are entitled to the income for life. It is true that the children of Alexander are respondents and may be treated as electing to follow the fund or capital into the lands. They may not survive their parents however, or if they do, other children may be born having an equal right to an election. Indeed it seems to us that the proposition is an exceedingly clear one, that the right of election is in the remainderman and not in those taking the income, and that until it is known who the residuary legatee is the power of election does not exist.

While therefore, we are by no means prepared to sanction the conduct of complainant, in every respect, touching the transaction developed in this case, we feel no hesitation in concluding that the decree below is unsustained by the testimony and should be reversed.

Decree reversed.