## MacGregor v. Gardner et al.

1. PARTIES IN CHANCERY. Where the husband, wife and their children, and other persons, were parties defendant to a chancery proceeding, pending which the husband died, and two of his co-defendants were appointed his executors, it was held, that as the heirs and executors, were within the jurisdiction of the court as individuals, they were charged with notice of the suggestion of the death of their co-defendant and of their substitution as his legal representatives; and that they could not object in the appellate court for the first time to the decree rendered, because they had not been made parties by service of original notice as the representatives of the deceased.

2. FRAUDULENT CONVEYANCE BY AN AGENT. A conveyance by an agent acting under a power of attorney, of the property of his principal, without consideration and for the purpose of acquiring the title in himself, will be treated in equity as fraudulent and void.

3. POWER OF ATTORNEY: IRREVOCABLE. A power of attorney may be revoked by the principal, notwithstanding it is in terms irrevocable, unless it is coupled with an interest in the agent, or is supported by a consideration; and the use of the word "irrevocable" in a power, when not thus coupled or supported, confers no greater authority upon the agent than an ordinary power of attorney.

4. SAME. An agent acting under an irrevocable power of attorney has no power to dispose of the property otherwise than in the manner directed by the principal. His authority differs from a revocable power only in the fact that it cannot be recalled by the principal.

5. RESULTING TRUST. To establish a resulting trust in real estate against the person holding the legal title the proof must be clear and unequivocal. (*Noel* v. *Noel,* 1 Iowa, 423.)

*Appeal from Dubuque District Court.*

MONDAY, DECEMBER 22.

CHANCERY. A statement of the facts as disclosed by the record is presented in the opinion of the Court.

The case was presented to the Court on the part of the appellant, in elaborate oral and printed arguments by *Bissill & Shiras* and *John L. Harvey;* and on the part of the appellee by *James A. McKinlay.*

The counsel for the appellants, in addition to a discussion of the evidence, presented the following points and authorities:

1. The heirs of Alexander MacGregor are necessary parties to this proceeding, and they must be before the court before the decree can be entered. There is also a demand for a money decree, and the executors are necessary parties. Story Eq. Jur., § 1526; Story Eq. Pl., § 70; *Poore v. Clark*, 2 Atk., 515; *Pipe et al.* v. *Bateman et al.*, 1 Iowa, 369; *Clemans* v. *Elder*, 9 Id., 272; *Munch* v. *Cockerel*, 8 Sim., 219; *Hallett & Davis* v. *Hallett et al.*, 2 Paige Ch., 15; *Key's Executors* v. *Lambert*, 1 Hen. & Mun., 330; *Johnson v. Rankin*, 3 Bibb, 104; *Mayo* v. *Tomkies*, 6 Munf., 520; *Sheppard* v. *Starks*, 3 Id., 29; *Husston* v. *McClaity's Heirs*, 3 Litt., 274; *Wilson et al.* v. *Hamilton et al.*, 9 John., 442; *Malin* v. *Malin*, 2 John. Ch., 238; *Kennedey's Heirs* v. *Kennedey's Heirs*, 2 Ala., 572; *Read* v. *Read*, 8 Rich. Eq., 145; *Jerse* v. *Bennett*, 39 Eng. Law and Eq., 225; *Prentice* v. *Kimball*, 19 Ill., 320.

2. The defendants' answer, responsive to the bill, is evidence equal to that of one credible witness. 2 Daniels' Ch. Pr., 983, note 2; *Armstrong et ux.* v. *Scott et al*, 3 G. Greene, 433; *White* v. *Hampton*, 9 Iowa, 181; *The State v. Tilghman*, 6 Id., 496; *Davis* v. *Stevens*, 3 Id., 158; *Waldron* v. *Zollikoffer*, Id., 108; *Pierce* v. *Wilson et al.*, 10 Id., 20; *Cheuvete* v. *Mason*, 4 G. Greene, 231; *Clark* v. *Langworthy*, 3 Iowa, 563.

3. The answer of a defendant is evidence for a co-defendant. 2 Daniels' Ch. Pr., 981, note 1.

4. A replication is never evidence. Story, Eq. Pl., § 878, 879; 2 Daniel's Ch. Pr., 967, 969, and notes.

5. Plaintiff attempts to make his replication evidence by treating our answer as a cross-bill. This Court has decided that it is not a cross-bill. *MacGregor* v. *MacGregor et al.*, 9 Iowa, 65, 77.

6. As to purchases in the name of third persons, the rule is, that whether the subject matter of the purchase be freehold, copyhold, leasehold or personal property, merely; and whether the conveyance or transfer be taken in the names of the purchaser and others jointly, or in the names of others without that of the purchaser, whether in one name or several, whether jointly or successive; the trust or beneficial ownership appertains to him who advanced the purchase money, or if there be more than one, then to the several persons so having advanced it, according to their respective proportions; and in equity such beneficial owner or owners may prove the facts and enforce their rights. 3 Phill. Ev., ed. 1859, being a part of note 508, and cases there cited.

7. Parol evidence, and particularly oral evidence of the declarations of the nominal purchaser, or persons holding the legal title, are admissible to establish the facts necessary to raise a trust. 3 Phill. Ev., ed. 1859, being a part of note 508; *Perry* v. *Head*, 1 Marsh., 46; *Buck* v. *Pike*, 11 Maine, 9; *Lessee of German* v. *Gabbald*, 3 Binn., 302; *Wallace* v. *Duffield*, 2 Serg. & Rawle, 521, 526.

8. Where land is bought with borrowed money, it belongs to the borrower, not the lender. *Buck* v. *Pike*, 11 Maine, 9, 25; *Boyd* v. *McLean*, 1 John. Ch., 582.

9. When one furnishes part of the purchase money he is entitled to the land in proportion to the money furnished. *Stark's Heirs* v. *Cannady*, 3 Litt., 399, 402; *Wallace* v. *Duffield*, 2 Serg. & Rawle, 521, 527.

The counsel for the appellee presented the following propositions of law and authorities:

1. Alexander MacGregor was guilty of a fraud in taking the law into his own hands. Supposing he and his family were the equitable owners of the lands, it was not for him to execute deeds as attorney in fact for James, the person

against whom he was about to set up equities. He should have surrendered the powers of attorney, and filed a bill to establish the equities. The deeds were clearly fraudulent, and should have been set aside long ago. *Sturdevant* v. *Pike*, 1 Carter's Ind., 227; *Moore* v. *Moore*, 1 Seld., 256; *Michoud* v. *Girod*, 4 How., 503.

2. The powers of attorney from James to Alexander MacGregor did not authorize the execution of conveyances except to purchasers. The Gardners were not purchasers, and did not pretend to be. For that reason the deeds were fraudulent, and should at once have been set aside.

3. The most valuable portion of the lands, namely, those which the defendants call the ferry property, were not pretended to be held for any other purpose than for the "trust fund of $2,000." Therefore the deeds, so far as affected them, should have been immediately set aside, after the Supreme Court had decreed that the trust fund was not vested in them.

4. The deeds being void for want of power in the attorney to execute deeds to persons not purchasers, the defendants can have no relief. They have filed no cross-bill, nor is any one of their answers made a cross-bill. *MacGregor* v. *MacGregor*, 9 Iowa, 77.

BALDWIN, J.[1]— This suit was commenced in the Clayton District Court, at the May Term, 1853. It was finally heard in the Dubuque District Court, upon change of venue. A full and concise history of the case, and the issues made by the pleadings, may be had by reference to the case of *MacGregor* v. *MacGregor et al.*, 9 Iowa, 65. By reference to the statement of the case as above reported, it will be found that the object of the complainant's petition, was to set aside and to have declared as fraudulent and

---

[1] Lowe, J., dissenting.

void, certain deeds to real estate made by Alexander Mac-Gregor as the attorney of James MacGregor, Jr., to George D. and Egbert Gardner. James claims, that the lands thus conveyed were purchased with his money, and for his own use and benefit; that the said deeds were made by Alexander, as his attorney, to the Gardners, without consideration and for a fraudulent purpose, and prays that the same may be cancelled and declared void.

Alexander claims, that the lands thus conveyed were purchased for his use, but that the titles thereto were taken in the name of James, as he, Alexander, was at that time involved and could not hold property in his own name.

It is also claimed, by Alexander, that $2,000 of the money thus invested, was a certain trust fund willed to his wife, Ann G. MacGregor, by his brother, Gregor Mac-Gregor; that Duncan MacGregor, another brother, and the complainant, were the trustees of this fund; that the said trustees assented to the investment of this fund in the lands thus conveyed; and that the lands purchased therewith should inure to the use and benefit of the *cestui que trust;* that after it was ascertained that James refused to recognize the purchases thus made as an investment of this trust fund, the said Alexander conveyed the said property to the Gardners, under his power of attorney, by its terms irrevocable, for the purpose of protecting the rights of the beneficiaries under the will; that the said Gardners now hold the said property in trust for the said legatees.

At the June Term, 1857, the cause was submitted to the court, and a decree was entered in which it was found, that the $2,000 was, by agreement of the trustees named in the bill, invested in the lands and estate known as the Ferry property, part of the property conveyed to the Gardners; and it was ordered and decreed, that " the undivided half of the aforesaid tracts of land are the fund of $2,000; that

the same should be conveyed by George D. Gardner and Egbert Gardner to George D. as trustee, to hold the same for the use of Ann G. MacGregor during her life; and afterwards to the use of the persons who shall be entitled to the same under the said claim of said will."

It appears, also, from the pleadings and evidence that in 1859 James came to the town of MacGregor, Iowa, where Alexander then resided, and insisted upon a settlement with Alexander; that he then asserted his right to the ownership of all the lands, the title of which was in him, denied the investment of the trust fund, as claimed, and threatened to dispossess Alexander and his family of said premises; that, acting under the fear of such threat, Ann G. MacGregor agreed to purchase of James all of his interest in said lands, and agreed to pay therefor the sum of $6,500, by releasing to James the $2,000 trust, and by giving her note for $4,500.

It also appears that in December, 1852, Ann G. and her infant children, Gregor and Gardner, instituted proceedings in the Supreme Court of the State of New York, against said James and others, for the purpose of restraining the collection of the $4,500 note; to have the agreement made at the time the note was given declared void; to have James and Duncan discharged as trustees; to have the Gardners declared the trustees, holding the ferry property in trust for said Ann, remainder to Gregor and Gardner MacGregor, her co-complainants; that Duncan and James should, as trustees, release all right to said property, and that all claims of Alexander, if any, might be ascertained and declared. This cause was determined against the complainant, Ann G. and her children, in favor of the respondent James. The cause determined in this State was appealed from, and also decided by this court in favor of the complainant James.

In the decision of the case by the Supreme Court of New York, it was held, that under the terms of the bequest the trustees had no power to change the character of the trust fund from personalty into realty. It was also found, that the ferry property was not purchased with this trust fund; and the court say, that even granting that such was the case, and that the right to follow and claim the investment of this fund did exist, that the right of election did not belong to the complainants.

"This," says JAMES, J., "was a bequest of personal property to Ann G. McGregor for life, and also to her husband for life, he her surviving, remainder over after the death of both to his next of kin. The capital was invested and was required to be kept invested for the benefit of the remainderman, and the tenant for life has only an interest in the income of that fund. She has no title to the capital, nor any right to control or dictate in its mode or manner of investment. The title to the fund for her life is, by the will, invested in the trustees, after that the capital belongs to the remainderman; and if the trustees have diverted the fund and made investments different from those directed by the will, the right to elect, whether the fund shall be followed into the new investment, or the trustees held personally responsible for the original amount, is with the remainderman and not with the tenant for life. This right of election in the remainderman cannot be exercised until after the estate becomes invested. Who the remainderman will be it is impossible to determine until after the death of the tenant for life."

The Supreme Court of this State reversed the decision of the District Court upon the grounds:

1st. That it was improper under the pleading to give the relief granted to respondents, as they filed no bills, nor were any of their answers made cross-bills, that the most

and all they could ask was, that they might be dismissed the court.

2d. The court regarded the question as *res adjudicata*, so far as it related to the trust fund. "It seems," says WRIGHT, C. J., "that this question was adjudicated between these parties in the New York case, and as long as that judgment remains in force it must be conclusive."

3d. Treating it as *res integra*, this court finds, first, that the evidence shows that the trust fund never was in fact transferred; and second, following the reasoning and conclusions of the court in the New York case, that the trust fund did not belong to Ann or Alexander, but to the residuary legatees; that the remainderman and not those having an income for life had the right to elect, &c.

Upon the reversal of the judgment by this court, a writ of *procedendo* issued, and the Court below directed to hear and determine the cause in accordance with the opinion of the court. During the pendency of this appeal, however, Alexander died, and, upon motion in this court, the executors of his will were substituted, and the necessary change made in the style of the cause.

Upon the 9th day of July, 1860, the cause was again heard and a decree entered in the District Court in favor of the complainant, setting aside a portion of its former decree, so as to comply with the opinion of the Supreme Court. At the commencement of this decree we find the following in the record:

"James MacGregor, Jr., *v.* Alexander MacGregor. In Chancery. Owing to the death of Alexander MacGregor, the style of this case is changed to: James MacGregor, Jr., *v.* George D. Gardner, Egbert Gardner, Duncan MacGregor *et al.*, and George D. Gardner *et al.* as executors of the estate of Alexander MacGregor.

The defendants appeared specially and moved the Court to set aside this decree, and among other causes assign

that the decree is against the executors of the estate of Alexander MacGregor, whereas the said executors have never been made parties to this suit in any manner, nor served with process, and were therefore not under the jurisdiction of the Court." This motion was sustained, and another decree entered by which it was ordered and found that the $2,000, referred to in the pleadings and claimed to be invested in a portion of the lands in controversy, is not so invested. The Court also finds, that the other matters in controversy are not ready for a final hearing without an examination of accounts between the parties. It was therefore ordered and directed, that all matter of accounts between said parties be referred to H. A. WILTSE, Esq., special master, to report an account between the parties, and also to report with whose money the several tracts of land in controversy were bought, the amount paid for each tract, and for whose use the same were bought, also the amount expended in improvements on the said property and by whom so expended, &c. Under this order further testimony was heard by the master, after which he filed his report, finding that the property was purchased for James and with his money, and that there was due him from the estate of Alexander the sum of $1,723. Exceptions to this report being overruled, a decree was entered accordingly, and from this judgment the defendants again appeal.

The first question presented by the counsel for appellant is, that the heirs and executors of Alexander MacGregor were not properly brought into Court, and made parties to this proceeding before the final judgment and decree were rendered. Ann MacGregor, the wife, and Gardner and Gregor, the children, were made parties prior to the death of Alexander. George D. Gardner and Duncan MacGregor were parties to the original proceeding. The widow, the children and executors were therefore as individuals in Court, and bound to take notice of every order affecting

the rights of either. They were therefore presumed to have taken notice of the suggestion of the death of Alexander and the substitution of his legal representatives, as made by the order of the Court. It appears by reference to the records of this Court, that the death of Alexander was suggested, and upon motion the proper parties were substituted. Whether this was done in a proper manner we think it too late now to determine. Again, the counsel of appellant raised this objection in the Court below, in the motion to set aside the decree rendered August 9th, 1860. This motion was sustained, whether for this cause or some other, does not appear. On the 14th of the same month another decree was entered, and no exceptions were then taken, because the heirs and executors were not brought in in their representative capacity. On the contrary the respondents recognized this decree as formal, and proceeded to introduce their evidence before the referee therein appointed. This preliminary question being thus disposed of, the main question arises for our determination, that is with whom are the equities of this cause? In entering upon the consideration of this question we are met at the very threshold with the position of appellee, that Alexander MacGregor was guilty of a fraud in taking the law into his own hands; that if he and his family were the equitable owners of the lands it was not for him to execute deeds as attorney in fact for James, the person against whom he was about to set up equities; that the powers of attorney did not authorize the execution of conveyances, except to purchasers; that the Gardners were not purchasers, and did not pretend to be, and for that reason the deeds were fraudulent, and a court of equity should set them aside. We regard the principle as well settled, that where an agent acting under a power of attorney conveys the property of his principal without consideration, and with the purpose of acquiring the title in himself, that such conveyances in a

court of equity would be declared fraudulent and void. Thus in the case of *Sturdevant et al.* v. *Pike et al.*, 1 Carter (Ind.) R., 277, it was held, that if an agent appointed to sell lands, caused a conveyance to be made to himself, such conveyance, unless ratified by his principal, will, on application of the principal or his heirs within a reasonable time, be set aside by a court of equity, without inquiry as to its fairness. "In *Moore* v. *Moore*, 1 Seld. (N. Y.), 256, it was held, that an agent employed to collect a mortgage belonging to his principal, cannot purchase the property at a mortgage sale either himself, or through the agency of a third person for his own benefit." In the case of *Michoud et al.* v. *Girod et al.*, 4 How. S. C. R., 503, the validity of a sale made by the executors of an estate to third parties with the view of obtaining the title in themselves arises, and the equitable rule that controls such sales is by Justice WAYNE ably discussed. Nicholas Gerod and Francois became the possessors of their testators' estate. In this instance Laiguel and St. Felix were the instruments of the executors. They bid off the property, paid nothing, received titles, and conveyed what they nomially bought to the executors. The Supreme Court concurred in the judgment of the Circuit Court in setting aside the sale thus made. The learned Justice in his opinion says: "But the morality and policy of the law as it is administered in courts of equity, induce us to add that those purchases were fraudulent and void, and may be declared so without any further inquiry, upon the ground that they were made by the intervention of persons who were nominal buyers for the purpose of conveying it to the executors. Such transaction carries fraud upon the face of it." "The rule as to persons incapable of purchasing particular property, except under particular restraints, on account of the rules of equity, is compendiously given by Sir Edward Sugden in his second section of Purchases by Trustees and Agents.

It has been adopted by almost every subsequent writer, and we cite the passage with confidence, having verified its correctness by an examination of all the cases cited by him, by an examination also of other cases in the English Courts, and of cases in the courts of chancery of several of the States in our Union, sustaining the doctrine to the fullest extent, of the incapability of trustees and agents to purchase particular property for the sale of which they act representatively, or in whom the title may be for another. He says, "It may be laid down as a general proposition, that trustees, unless they are nominally such, to preserve contingent remainders, agents, commissioners of bankrupts, assignees of bankrupts, solicitors to the commission auctioneers, creditors who have been consulted as to the mode of sale, or any person who by their connection with any other person, or by being employed or concerned in his affairs, have acquired a knowledge of his property, are incapable of purchasing such property, except under the restraints which will shortly be mentioned. For if persons having a confidential character were permitted to avail themselves of any knowledge acquired in that capacity, they might be induced to conceal their information, and not exercise it for the benefit of the persons relying upon their integrity. The characters are inconsistent." 2 Sug. Vendors and Purchasers, 109. The case of *Wormely* v. *Wormely*, 8 Wheat., 421, is also cited, in which the Court declared, that no rule is better settled than that a trustee cannot become the purchaser of a trust estate. He cannot be at the same time vendor and vendee. So also in the case of *Prevost* v. *Gratz*, 6 Wheat., 481, it was so held; and the rule reaffirmed in *Rings et al.* v. *Binns et al.*, 10 R., 269, 281, by its application to an agent who had bought land to which his principal was in equity entitled. So, also, in the case of *Oliver* v. *Piatt*, 3 How., 333; and affirmed in *Church* v. *Marine Insurance Company*,

MacGregor v. Gardner.

1 Mason, 341, that an agent or trustee cannot, directly or indirectly, become the purchaser of the trust property which is confided to his care. So, also, in the case of *Davoue* v. *Fanning*, 2 Johns. Ch., 252, it was affirmed, that if a trustee or person acting for others sell the trust estate and becomes himself interested in the purchase, the *cestui que trusts* are entitled as of course to have the purchase set aside, and the property re-exposed to sale under the direction of the Court. The inquiry in such a case is not whether there was or was not fraud in fact. The purchase is void and will be set aside, at the instance of the *cestui que trust*, and a resale ordered, on the ground of the temptation to abuse, and of the danger of imposition inaccessible to the eye of the Court. " The general rule," says Justice WAYNE, "stands upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity. It restrains all agents public and private; but the value of the prohibition is most felt, and its application more frequent, in the private relations in which the vendor and purchaser may stand toward each other. The disability to purchase is a consequence of that relation between them which imposes on the one a duty to protect the interest of the other, from the faithful discharge of which duty his own personal interest may withdraw him. In this conflict of interest the law wisely interposes. It acts not on the possibility that in some cases the sense of that duty may prevail over the motives of self-interest, but it provides against the probability in many cases and the danger in all cases, that the dictates of self-interest will exercise a predominant influence and supersede that of duty. It therefore prohibits a party from purchasing on his own account that which his duty or trust requires him to sell on account of another, and from purchasing on account of another that which he sells on his own account."

"The rule of equity is in every Code of Jurisprudence with which we are acquainted, that a purchase by a trustee or agent of the particular property of which he has the sale, or in which he represents another, whether he has an interest in it or not, *per interpositam personam*, carries fraud on the face of it."

We have thus fully quoted from this able and elaborate opinion, not only from the fact that it is to be regarded by us as the established rule of the highest tribunal in the land, but from the fact that the reasoning is so clear, and to our minds unanswerable, and peculiarly applicable in the determination of the controlling question in this case. It is admitted by the defendants, that the deeds to the Gardners, which the complainants ask to be set aside, were made without consideration and for the sole purpose of defeating the title of James, and vesting the property in the attorney who made the sale. It is conceded, that the deeds were thus made to advance the interest of the agent or trustee, and to deprive the beneficiary of his legal rights. Under the rule as above given, this transaction carries fraud on the face of it, and a court of equity without further inquiry as to the equities of the person making such sale, should at once set such sales aside. It is assumed by the counsel of appellant, that Alexander did not take the law into his own hands, when he conveyed to the Gardners, but that he did what James desired him to do when he gave him the irrevocable powers of attorney ; and that was to convey this property at his discretion, and for his own benefit. That there is no rule of law or equity, that required him to surrender his powers of attorney, and file a bill in equity to establish his rights, when James had empowered him to do what would accomplish the same object; and that every man has a right to exercise the authority conferred upon him for the protection of his own rights. It is claimed that the authorities above referred

to, are applicable only where the attorney or agent had no interest in the thing, where he had no rights to protect, and are therefore not in point. Does the fact that the powers of attorney under which Alexander acted, were made irrevocable, so change the character of the trust imposed, as to place this transaction beyond the limits of the rule, which declares such sales fraudulent upon their face?

The mere fact that the power of attorney is itself declared irrevocable, does not prohibit its revocation, nor does it establish the fact, that the person making the same yields all right or claim to the property authorized to be sold, or that the person upon whom such power is conferred, has the right to sell and dispose of the property entrusted to his care, without consideration, or without being held accountable for the faithful discharge of his trust. "The general rule is," says Story on Agency, § 476, " that the principal may revoke the authority of his agent at his mere pleasure. But this is open to some exceptions, which, however, are entirely consistent with the reason upon which the general rule is founded. One exception is when the principal has expressly stipulated that the authority shall be irrevocable and the agent has an interest in its execution. Both of these circumstances must concur, for although in its terms an authority may be expressly declared to be irrevocable, yet if the agent has no interest in its execution, and there is no valid consideration for it, it is treated as a mere nude pact and is deemed in law to be revocable, upon the general principle, that he who alone has an interest in the execution of an act, is also entitled to control it." The use of the word " irrevocable" alone is not evidence that the power is coupled with an interest: if so, it would not be necessary that both of these circumstances should concur. The powers of attorney under which these deeds were made read as follows: "Know all men by these presents, that I, James MacGregor, Jr., &c., being

seised in fee of certain lands in the County of Clayton, Iowa, have nominated, constituted and appointed Alex. MacGregor * * * my true and lawful attorney, irrevocable, for me, and my name to lease, devise and sell said lands * * to such person or persons, upon such terms, * * * and for such prices as he may see fit."

The word, " irrevocable," signifies, not to be recalled or revoked. · Therefore, when used in the above connection it shows, that it was the intention of the principal that the authority thereby conferred, should not be recalled.. It cannot however be inferred from its use that the agent was thereby invested with any greater power of disposition or authority in relation to the property to be sold, than if this word had been omitted. But it is not the policy of the law to deny to the person making such powers irrevocable the right to revoke such authority, notwithstanding the fact that it was the fixed design of the parties so to do when they were made. If, however, the power is coupled with an interest, or the agent is interested in its execution, it shall not be revoked.'

Conceding, therefore, that the power is by its terms made irrevocable, and when the agent has an interest in its execution, the law declares that it then cannot be revoked, this fact still does not of itself give the agent any power to dispose of the property, except in the manner directed by the principal. The authority is continuous, but in other respects the same as if revocable. If the agent therefore exceeds his authority or abuses the trust reposed, equity will afford the principal the proper relief. Alexander had no authority conferred .upon him to dispose of the lands without consideration. He was required to act for the best interest of the principal, and granting that he had an interest in the execution of the authority conferred, he could not dispose of the property of which he had the sale, in such a manner as the title would inure to his benefit, for

the rule of equity is, that a purchase by an agent of the property of which he has the sale, or in which he represents another, whether he has an interest in it or not, *per interpositam personam*, carries fraud on the face of it.

The prayer of the complainant is that these deeds be set aside. The respondents do not file a cross-bill or claim any relief in their answer, but assume that Alexander, under the powers of attorney, and having certain equities in said lands, had the power to dispose of said lands as he did; and that the respondents should not be permitted to interpose such equities to prevent the disposition of the deeds as prayed for by complainant. Applying the equitable rule, as given us by the Supreme Court of the United States in *Michoud* v. *Girod, supra,* it is the duty of the Court without an investigation of such equities at once to set such sales aside. But conceding for the sake of the argument that the equitable rule we have thus applied does not fully cover this case, and that the deeds should not be set aside without an examination of the equities of the respondents in the land thus conveyed. It being admitted that the deeds were made without consideration and for the purpose of placing Alexander in a better position to have his equities declared, it is then with respondents to show that the legal title was taken in the name of James for the purpose of creating a trust. In other words, the respondents, as against James who holds the legal title, will have to make it appear that Alexander was the equitable owner thereof. In order to do this the respondents undertake to establish a resulting trust, as arising by implication from the fact that the purchase money was furnished by Alexander. The rule is not controverted, that to establish a resulting trust, as against the person holding the legal title the proof should be clear and unequivocal. In *Noel* v. *Noel,* 1 Iowa, 423, WRIGHT, C. J., says: "The legal title is conceded to be in the defendant. To divest it upon the

ground that he holds it or any part of it as trustee for the complainant, the testimony should be clear and satisfactory. It is a rule too well understood to need repetition, that parol testimony to establish such trust should be received with great caution, and should be clear, and such as goes distinctly to prove the facts necessary to create such resulting interest. The testimony must not be loose and equivocal. It is contrary to every correct principle, that the legal title should be divested upon parol testimony which is not clear, satisfactory and distinct."

The evidence introduced upon the trial of this cause and certified up to this Court, is very voluminous, containing the letters, declarations and transactions of the brothers, James and Alexander, in relation to the purchase, improvements and disposition of the lands in dispute during a period of ten years.

This record and evidence have been thoroughly sifted and placed in its strongest light before us by able counsel upon both sides. This cause has, not only from the peculiar relations of the parties thereto, from the length of time it has been pending in the Courts of this State, and its final issue so anxiously looked for, but from the importance of the questions and interests involved, as well as from the zeal and ability manifested by counsel in its presentation, received from each member of this Court that careful consideration, we trust, to which it is entitled. We have not been unmindful of the fact that our final determination will most materially affect the interests of the widow and the minor children of the deceased, a class of suitors that always draws strongly upon the sympathies of Courts, and whose rights it is the peculiar prerogative of courts of equity to guard and protect.

It would unnecessarily prolong this opinion to discuss the bearing this mass of evidence has had upon our minds, and state the reasons at length that have impelled us to our

conclusions. It is sufficient to state that a majority of the court cannot conclude, that the evidence so fully and clearly establishes the fact that the purchase money was furnished by Alexander, or that a resulting trust is so unequivocally established, as would justify a court of equity in divesting James of the legal title of any of the lands conveyed to the Gardners. In arriving at this conclusion, we have not been uninfluenced by the fact that the theory of Alexander's defense in relation to the investment of the $2,000 trust fund has been up-turned, not only by the former decision of this court, but also by the final adjudication of the Supreme Court and Court of Appeals in the State of New York. That the lands known and described by Alexander in his answer as the ferry property, were not purchased with the money advanced, as is claimed as a part of the trust fund, is settled beyond all controversy.

After this branch of the defense has thus been decided against Alexander, it seems to us that he cannot, upon the same answer, ask a court of equity to find that this same property was purchased with his own money, or money loaned to him by James, in the face of his own verified averment that it was purchased with a different fund. To determine the particular tracts of land embraced in what is called the ferry property, we have but to look to the answer of Alexander in folios 42 and 43, and to the declarations of trust made by the Gardners. From these it appears, without doubt, that the ferry property or the land claimed to have been purchased with this $2,000 trust fund, included not only the 160 acres in the Bazil Giard claim, and the 14.90 acres purchased from Burnett, but also the 40 acre tract and the 99.05 acre each purchased from Olmstead.

In relation to the King tract, we all concur in the opinion that the evidence clearly shows that the purchase-money was furnished by James. While the testimony

shows that the remaining tracts of land in dispute were purchased by Wadsworth, with money placed in his hands by Alexander for that purpose, this fact alone, when we take into consideration all the other circumstances connected therewith, is not of itself sufficient to disturb the title in James. Alexander, when this purchase was made had been acting as the agent and attorney of James in buying and selling property, collecting money, paying taxes, and attending to his business generally. Whether Alexander had money in his hands belonging to James when this land was bought, as is claimed by counsel, it is not important to consider, even if it could be determined. We are of the opinion that this land was bought, and the title taken in the name of James and Duncan with the same design, under the same understanding, that the other tracts were. What that understanding was is a secret, unrevealed by the evidence before us. If there was an understanding between these brothers that James was holding this property merely as the trustee of Alexander, it is truly remarkable that in all of the private letters that are introduced as having passed between them, no allusion whatever is made to such an arrangement.

If the claim of Alexander to the lands purchased by Wadsworth stood alone and unconnected with the other transaction, or, if he had not by his own acts closed the door of equity against him, a resulting trust might be implied, from the fact that he furnished the purchase money to Wadsworth. But, in the first place, it is admitted that the titles of all these lands were taken in the name of James to avoid their being reached by Alexander's creditors. And, in the second place, he had, without consideration, and for the purpose of defeating James' title, conveyed, under his power of attorney, all said lands to the Gardners. Either of these transactions was fraudulent upon its face.

VOL. XIV.—44

We unite in the opinion that the master erred in his statement of the account between these parties. The evidence satisfies us that the improvements made by Alexander were made with the knowledge and assent of James, and that he should be chargeable therefor. We also think that Alexander should be credited with a fair and reasonable compensation for his time and labor, as well as for the skill exercised in promoting the interest of James. We have adopted a statement of the accounts, herewith filed, as approximating to as just and equitable a statement of the amount chargeable to each, as we could arrive at, under the evidence. From this it will be seen that there is due to the representatives of Alexander MacGregor, deceased, from the complainant the sum of $3,263.71. Judgment will be entered in this court accordingly. In other respects the decree is affirmed, but at the cost of the appellee.

LOWE, J., dissenting.—This cause involves no seriously controverted principle of law. Great and praiseworthy as has been the efforts of my associates to reach a just conclusion upon the facts, I have, nevertheless, been compelled to differ with them in their interpretation of the evidence. This want of agreement in our conclusions upon the same facts arises undoubtedly in part from the circumstance that we have viewed the evidence from different points of observation. They, the majority of the Court, finding no sufficient evidence to satisfy them of the irrevocable character of the power of attorney under which Alexander MacGregor conveyed the property in dispute to the Gardners, regarded said conveyances as nullities, being, in their judgment, without consideration; and treated the whole case as if the legal title of the property was yet in James MacGregor; requiring the defendants in this aspect of the case to show by evidence clear and conclusive that

said property was so held by James MacGregor for their use.  On the other hand I find as a preliminary question arising from the issues made in the pleadings, that said power of attorney was irrevocable, and that the agent, as a matter of fact, had an interest in its execution.  Hence, in my judgment, this is the stand-point from which the case is to be contemplated, and the rights of the parties determined.

Viewing the case, therefore, from this stand-point, I am not at liberty to assume that the title of all the land in controversy is yet in James MacGregor, but must assume, on the other hand, that it has rightfully and regularly passed out of him, and that it is incumbent upon him to show by evidence, clear and conclusive, that he has been wrongfully dispossessed.  In this aspect of the case, as well as by the condition of the pleadings, he holds the affirmative, and, therefore, must affirmatively show himself entitled to the relief for which he prays.

If the warrant of attorney expressly stipulated for its irrevocability, and that the agent had an interest in its execution, this would be conclusive on the parties upon that question, without further evidence.  In the absence, however, of any such stipulation, showing the existence of both facts, it is competent to prove by extrinsic evidence that the power was coupled with an interest, in which case the power becomes, in the language of Judge STORY, "from its own nature and character, in contemplation of law, irrevocable, whether expressed to be so, on the face of the instrument conferring the authority, or not." Story's Agency, §§ 476, 477.

The reason of this doctrine is plain.  The agent having an interest in the thing itself, concerning which the power was given, the power when thus conferred, and united with the interest, partakes of the nature and qualities of a contract · and to allow a party to annul and set aside his

own solemn engagement, at his own pleasure, would result often, not only as a surprise to, but a fraud upon the rights of the agent, whilst it would be against the whole policy of the law, as well as the clearest principles of equity.

The preliminary and all-important inquiry in this controversy is, therefore, whether the powers of attorney under which Alexander conveyed to the Gardners were revocable or irrevocable. If the former and the conveyances were made without consideration, or for the benefit of the agent, then they should be held to be void and fraudulent as against the principal. If the latter, because of the equitable interest or estate which the agent had in the lands, then the conveyances were legitimate and proper, and should not be impeached for the want of consideration.

Upon this particular question the evidence, to my mind, is clearly with the defendants, especially in regard to some of the lands. Look first at the acts, conduct, and the relations of the parties prior and up to the time of the execution and delivery of said powers, and what does the evidence disclose? Why, that Alexander, as early as 1837, came to the Valley of the Mississippi, located at Prairie du Chien, Wisconsin, and in the summer of that year commenced running a ferry in connection with one Burnett, between Prairie du Chein and a point in Iowa, now called McGregor; that he and the said Burnett became the joint owners, about that time, for the purpose, perhaps, of protecting their ferry landing, of one hundred and sixty acres, known as the Spanish grant to Bazil Giard, Claim No. 1, situated on the west bank of the Mississippi, and at present constituting a part of the town site of McGregor; that afterwards, in 1841, they purchased for the benefit of their ferry, which they had been operating since 1837, lot 1, in fractional section 26, fourteen $\frac{90}{100}$ acres, situated one-half mile below the first tract above specified.

Intervening and contiguous to these two tracts were lots 1 and 2 in section 22, containing ninety-nine acres, and the N. W. of N. E. ¼ of section 27, containing forty acres; on both of which one Samuel B. Olmstead had a pre-emption claim which was afterwards recognized by the government. On the 4th of December, 1841, agreeably to the certificate of the Register of the Land Office, Olmstead entered the forty acre tract last above named, with money, as he states in his deposition, advanced to him by Alexander Mac-Gregor. All this occurred a year before it is known that James MacGregor had ever come to the West, or had anything to do with the business affairs of Alexander. In December, 1842, we have the first account of James Mac-Gregor being at Prairie du Chien, or in the West. In the meantime Alexander had become greatly embarrassed in his business transactions, making it unsafe, perhaps, to hold property in his own name. During this first visit of James to the West, Alexander, who had negotiated with Olmstead for the purchase of this forty acre tract (with some sort of understanding that his partner in the ferry operation, Burnett, was to be one-half owner) procured the said Olmstead to assign the Land Office certificate of purchase to and in the name of his brother James, which was accordingly done on the 12th of December, 1842. This assignment, Olmstead testifies, was made to James, at the request and for a consideration paid by Alexander. It is true James claims to have paid eighty dollars for the assignment of this certificate but so far from there being any proof of this fact, he admits by implication, that in this he was mistaken, by offering ten years thereafter, in Minnesota, and that too after this suit was commenced, to pay Olmstead the $80, which was declined upon the ground that he had been paid. There is nothing in all the evidence that I have been able to discover, to vary or contradict these facts, but on the other hand much to confirm.

And they explain not only the manner how, but the reason why the title of this forty acre tract was placed in James; that it was simply to protect it for the benefit of Alexander, who paid for it and was the equitable owner.

Now for the facts in relation to the ninety-nine acre tract, being lots 1 and 2 in section 22. In the winter of '44 and '45, James MacGregor returned to the West, as the avowed friend of Alexander, to sustain and assist the latter in his pecuniary embarrassments. During his visit, Samuel B. Olmstead testifies that he borrowed of him two sums of money, one sum of $126, which he afterwards repaid, and another sum of $120 or $140. With this latter sum on the 15th of March, 1845, he pre-empted lots 1 and 2 in section 22 aforesaid, and afterwards sold the same and transferred the certificate of purchase to James MacGregor. He states that the consideration of this assignment to James was $370 paid him by Alexander, and the cancellation of the debts due from him to James MacGregor for the money borrowed with which he entered the land. About the same time James stated the account between himself and Alexander in his own handwriting, as it was proven by several witnesses, in which he charged up the debt canceled against Olmstead to Alexander, thereby showing conclusively that the purchase was alone for Alexander's benefit, and that he paid and was to pay the entire consideration. Why the assignment of the certificate was made to James, and the patent in May following was issued by the government to him as the assignee of Olmstead, is sufficiently accounted for upon the ground that at that time Alexander could not with safety hold property in his own name, and James had come to the West by an arrangement with the whole family expressly to aid Alexander in his difficulties. The facts touching the pre-emption of this ninety-nine acre tract of land by Olmstead, and who advanced to him the consideration of the assignment to James MacGregor, do

not rest alone in the testimony of Olmstead. To escape the force of his testimony an attempt was made to impeach him, but very unsuccessfully in my judgment. They are abundantly confirmed by the declarations and admissions made at different times and to various persons. Take first the simple fact that James deliberately charged to the account of Alexander at the time, with his own pen, the $120 debt which he had canceled against Olmstead, and which formed a part of the consideration for the assignment of the Land Office certificate for lots 1 and 2 in section 22 to the said James. How could he have made such a charge except upon the idea that Alexander was the real party beneficially interested in said transaction.

This act of James is wholly inexplicable with the notion that he was the real purchaser. Then again, if any doubt exists upon this point it is removed, it seems to me, by a letter which James wrote to Alexander on the 20th of January, 1845, in which he holds the following language: "Have Olmstead get the certificate, and then he can assign it to me, and the patent can issue in my name; this will obviate all former difficulty, have nothing to do with it in appearance of owner, until the patent issues." The meaning of this extract from James' letter is too transparent to need any explication. After the assignment was made agreeably to his request, he obtains from the Government a patent, in May, 1845, and immediately on his return from Washington City, in the spring of 1845, to New York, when, as the assignee of Olmstead, he had obtained a patent from the Government for said land, he informed his brother Duncan of that fact, and said he got the patent for Alexander. Now all this transpired, and these admissions, both in acts and declarations, were made before he employed a lawyer (Oct., 1845), in the State of New York, to draw the power of attorney aforesaid; and they harmonize not only with what he told his lawyer at the time, but fully

explain why it was that his lawyer inserted the word, irrevocable, in the power of attorney. We are to suppose that no lawyer of the apparent intelligence and learning of Mr. Ellsworth would employ the word, irrevocable, in drawing an ordinary power to sell land. Nor would it be necessary for him to explain the legal effect of such a power, except upon the idea that the word, irrevocable, in a power of attorney has a technical meaning, and is intended to show that the same partook of the nature of a contract, and that the agent thus empowered was beneficially interested.

Ellsworth, in his deposition says, that at the time James MacGregor requested him to draw said power of attorney, he, the said James, explained to him the purpose or end sought to be obtained by them, and that he, Ellsworth, explained to James the legal effect of said power. Again, he states "that the explanation given to him by James MacGregor, of his object was briefly and substantially this: to give Alexander full power to dispose of certain lands and property near Prairie du Chien, and *receive the benefit of the same*, and at the same time to prevent the property being taken from him upon any outstanding debt or liability against Alexander. He declared his object to be to aid Alexander." * * * Again, "he said *what he did and was doing was for Alexander's benefit.*"

How James could hold such language in connection with his explanation of the object he had in view in authorizing Alexander to sell the lands, the legal title of which was vested in himself, is utterly inconceivable upon any other hypothesis than that Alexander was the equitable owner, and beneficially interested in the sales. But this latter theory accords exactly with all that he did and said, touching the premises, before, at the time of the execution of said power, and subsequent thereto.

Now let us see what were some of his subsequent acts and declarations.

He told the witness, John Thomas, he was not in the West on his own business, but for the purpose of securing the land where the town of MacGregor now is for the benefit of the children of Alexander MacGregor. He told his brother-in-law, N. Vanderworker, in the summer or fall of 1848, that he had purchased lands at MacGregor's Landing, embracing or securing the ferry grounds. He remarked to the witness that the purchase was one of great importance to Alexander, that he had made it for his benefit; said it was nothing he ever expected to realize any benefit from; and mentioned that it would not do for Alexander to take title to hold the property, as he had no capacity to make property or to keep it; and that his circumstances in business were not such that he could hold property, &c.

George D. Gardner, in his deposition states, that on the 12th of August, 1848, at the request of James MacGregor, he drew a power of attorney from the said James to Alexander MacGregor to purchase and sell lands in Wisconsin, Illinois and Iowa, " and said that he wanted it so drawn, that Alexander would have full power to buy and sell lands in said States; that he did not want Alexander to be sending him every little while a deed to execute.; that it was all for Alexander's benefit, and that he did not want to be troubled with it," &c.

Of the same general purport is the testimony of Duncan MacGregor, F. Hoag, C. J. Leonard, Esq., Cornell, Wordsworth and some others, to which it is unnecessary to allude in detail. A letter, however, written by James on the 28th day of April, 1848, to Alexander, ought not to be overlooked. Among other things it says.: "As to the amount that should be deeded to you whenever there is a chance to deed to you free from its going to others, I do not think there will be any difficulty between us on

that score.   Please communicate to me what you think would be right as to deeding to you."

Now to my mind these repeated declarations, written and verbal, made under a variety of circumstances, and to various persons, both relatives and strangers, in different states and localities, ranging through a period of six or seven years, all of the same general purport, not only estop James from denying the same, but absolutely leave no room whatever to doubt, that at the time said power was executed and delivered, Alexander was the equitable owner of the lands he was authorized to sell, and as such had an interest so coupled with the powers, as imparted to them the attributes of contracts; and therefore irrevocable in their nature.   This important fact being found as a preliminary question in this controversy, upon what theory, it may be asked, should the same be determined?   Certainly not upon the assumption, as a starting point, that the legal title of the lands in dispute are all still in James, simply because Alexander had conveyed the same under the power of attorney, without any other consideration than that of another trust perhaps in favor of himself and family. This it was competent for him to do as the equitable owner thereof; and when so done, it is not a matter of which James could justly complain.   Having clothed Alexander with an irrevocable power to sell, he thereby stipulated in legal contemplation, that Alexander might make such disposition of the property as any other rightful owner could do.   In this aspect of the case he was lawfully divested of the legal title, and a court of equity cannot restore it again to him except upon clear and unquestionable proof on his part, that he has in some way been wrongfully or fraudulently dispossessed, and in this respect he holds the affirmative of the issue, and indeed this is the attitude in which the pleadings in this case places him.

The question then recurs, whether the plaintiff has sustained his complaint by competent proof. If he has, I confess my mind is lamentably at fault in discovering where it is to be found in the record before us. If it is claimed that it is to be found in the acts and declarations of Alexander in his lifetime, tending to show that he was simply acting as the agent of James, in the purchase, sale and management of said property, the reply, in the first place, is, that these do not amount to a tithe of the confessions made by James to the contrary, to which we have already alluded. And secondly, such as they may be can readily be referred to the relation of trustee and *cestui que trust* which existed between the parties, and which had been created for the specific purpose of protecting, for the time being, the property from the creditors of Alexander, and to assist him in and through his pecuniary embarrassments; and which perhaps finds its best illustrations or explanation in the letter addressed by James to Alexander from Washington City in January, 1845, with reference to the ninety-nine acres pre-empted by Olmstead, in which he advises Alexander to let the patent for said land issue in his name, and that he, Alexander, should have nothing to do with it in appearance of owner until the patent issues.

Again, we have already insisted that this peculiar and confidential relation existing between the parties as brothers, with reference to the property in controversy, established by a family arrangement for the benefit of Alexander, abundantly accounts for the reason why the legal title of the land was vested in James; and, therefore, in the adjustment of the rights of the parties, he is not entitled to any special advantage from this circumstance.

Now, in regard to the forty acre, and the ninety-nine acre tracts above described, we have already shown that James, in the purchase thereof, advanced no money except $120, and this sum not as a purchaser himself but as a loan

to Olmstead, who pre-empted both tracts. And when Olmstead sold the same to Alexander for a consideration, which he swears was paid him by Alexander, except the $120 loaned as aforesaid, and the legal title placed in James, for a purpose already explained, James canceled the loan against Olmstead and charges the same to Alexander, who got the benefit thereof as the equitable owner of said land. So that really, so far as the evidence in the cause goes, James would seem to have scarcely the semblance of a claim to these two tracts, beyond that of a naked legal title which he at one time held in trust for his brother.

It is true Alexander, in his answer, makes a statement in regard to these two tracts of land which somewhat embarrasses his right in the premises, but to which an undue importance has been · attached. It is that they formed a part of the ferry property, and constituted a portion of the trust fund property, implying thereby that they had been purchased as the other ferry property had been, with the fund left by Gregor MacGregor at his decease to James and Duncan MacGregor, in trust for Alexander and wife and children, which it is claimed is consistent with the idea that these tracts had been purchased by Alexander in the method stated in another part of his answer, and shown by the evidence in accordance therewith. If this statement tends somewhat to confuse defendant's chain of evidence establishing title to these two tracts, it does not, when taken in connection with the whole answer, materially diminish the validity of their claim, whilst upon the other hand it adds nothing whatever to the strength of plaintiff's claim thereto; for it is not pretended by him or any one else, that the purchase which he made of Burnett's interest, with what was understood by the parties at the time to be the trust fund aforesaid, included the two tracts in question. Indeed the plaintiff, in his replication, denies that they constituted any part of

the ferry property, nor does he pretend to set up any claim to them in virtue of his purchase from Burnett.

If the inference drawn from this statement, as above suggested, be a just one, still the most that can be said about it, is that the defendants' counsel in drawing the answer, thought proper, out of abundance of caution, to present two distinct and independent grounds or sources of claim to the property; one founded upon a purchase of Olmstead with his own private means, the other upon a purchase made with or out of the trust fund. The latter proves to be without any foundation, whilst the former has been reasonably established by a preponderance of evidence.

But there is another, and, to my mind, a more satisfactory explanation of this statement, to be found in the fact that the answer of Alexander seems to have been drawn up on the theory that the two thousand dollar trust fund left in the hands of James and Duncan MacGregor, had in fact been transferred and invested in the West, for the purpose and benefit of Alexander's wife and children.

Fifteen hundred had been given to Burnett for his undivided half of the ferry privilege and the two lots of ground appurtenant thereto, to wit. : The fourteen acre lot in sec. 26, and the Bazil Giard claim. Five hundred dollars had been sent out before that to Alexander, which had been expended in the erection of a tavern house at MacGregor. These two sums in their aggregate covered the amount of the trust fund, and were advanced and paid by James, who, at the time, insisted and declared to his co-trustee, Duncan MacGregor and others, that he intended such advancement to be the execution of the trust; and upon the idea that it was executed, and that Alexander and family were enjoying the benefit thereof in the West, that he demanded and obtained from Alexander and his wife a receipt for the interest thereon for several years without the payment of any additional money to them. These receipts were

exacted and given, it is supposed, for the reason that the trustees had not yet been discharged by any competent tribunal from their fiduciary relation to the fund, and that they were required by the will of Gregor MacGregor creating the trust, to pay annually to the beneficiaries the interest upon the fund.

Now, it must be remembered, that Alexander in his answer does not allege that the forty and the ninety-nine acre tracts were purchased with the trust fund, but that he had conveyed them to the Gardners as a part of the trust fund property, meaning simply thereby that he intended that these two tracts, (which had been considered on account of their locality a part of the ferry property,) should, with the other ferry property, represent the whole trust fund, in lieu of that which had gone into the tavern building. In this aspect of the case, which is consistent with the whole answer, no unfavorable inference should be drawn against the defendants from the statements in question.

The foregoing sufficiently exhibits the grounds of my dissent from the opinion filed by a majority of the Court, and it is not necessary to consider in detail the title to the other tracts of land included in this controversy. I will simply state what, in my judgment, the decree should be in this case, and that will indicate the conclusion to which my mind has been brought by the evidence in relation to the respective rights of the parties.

Bound, as I think we are, by the decision of the Supreme Court of New York in relation to two of the tracts, to wit: The one hundred and sixty acres in the southeast corner of the Bazil Giard grant, and lot one in fractional section 26, township 95, containing fourteen $\frac{9\,0}{1\,0\,0}$ acres. I would award, first, an equal portion of them and the ferry franchise to each of the parties. Second, I would decree to the heirs of Alexander, as against the plaintiff, the following

tracts: N. W. $\frac{1}{4}$ of N. E. $\frac{1}{4}$ of sec. 27, containing forty acres; lots one and two of fractional sec. 22, township 95, R. 2 West, containing ninety-nine $\frac{05}{100}$ acres; lot one, in section 11, township 94, R. 3 West, containing fifty-one $\frac{30}{100}$ acres; lots two, three and four, in section 11, T. 94, R. 3 W., containing one hundred and fifty-three $\frac{65}{100}$ acres; lots one, two and three, in section 23, and lot one in section 26, T. 95, R. 3 W., containing one hundred and eighty-seven $\frac{35}{100}$ acres. Third, the N. W. $\frac{1}{4}$ and lot 1 in section 27, T. 95, R. 3 West, and the undivided half of lots two, three and four, in section 35, T. 95, R. 3 W., containing one hundred and sixty-two and $\frac{70}{100}$ acres.

The only serious doubt which I would have in making such a decree would be in relation to the land awarded to the plaintiff, under the third head. Still there are some considerations, which it is unnecessary now to name, that would reconcile me to such an adjustment of the controversy. Of course, upon this basis of the settlement, I should state the money account between the parties different from the one stated by the majority of the Court.